**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | |
|---|---|
| VALERO REFINING COMPANY-OKLAHOMA, a Michigan corporation,<br><br>        Plaintiff,<br><br>v.<br><br>3M COMPANY; E.I. DUPONT DE NEMOURS AND COMPANY; THE CHEMOURS COMPANY; NATIONAL FOAM, INC.; BUCKEYE FIRE EQUIPMENT COMPANY; KIDDE-FENWAL, INC.; ARKEMA, INC.; DUPONT DE NEMOURS, INC.; CORTEVA, INC. and DOE DEFENDANTS 1 to 20,<br><br>        Defendants. | MDL No. 2873<br><br>Master Docket No. 2:18-mn-02873<br><br>Judge Richard Mark Gergel<br><br>Civil Action No. 2:19-cv-02192-RMG<br><br>FIRST AMENDED COMPLAINT WITH JURY DEMAND |

### FIRST AMENDED COMPLAINT
### (JURY TRIAL DEMANDED)

NOW COMES Plaintiff Valero Refining Company-Oklahoma, by and through its attorneys, for its First Amended Complaint and Demand for Jury Trial pursuant to Case Management Order Nos. 3D and 3E, *In re: Aqueous Film-Forming Foams Products Liability Litigation*, 2:18-mn-02873-RMG (D.S.C.), states as follows:

### I.
### THE PARTIES

1.     Plaintiff Valero Refining Company-Oklahoma ("Valero" or "Plaintiff") is a Michigan corporation with its principal place of business in San Antonio, Texas.  It owns and operates the Ardmore Refinery in Carter County, Oklahoma.

2.     Defendant 3M Company ("3M") is a Delaware corporation, with its principal place of business in St. Paul, Minnesota.  3M designed, manufactured, marketed, and/or sold aqueous

film-forming foam ("AFFF") products containing Long-Chain PFAS, and was in the business of designing, manufacturing, and/or selling AFFF products containing Long-Chain PFAS, that were purchased and/or used by Valero or were stored and/or used on properties owned and/or operated by Valero.

3.     3M does business throughout the United States, including conducting business in Oklahoma, and is registered to do business as a foreign for-profit corporation in Oklahoma with the Secretary of State.

4.     Defendant E.I. du Pont de Nemours and Company ("Old DuPont") is a Delaware corporation with its principal place of business in Wilmington, Delaware. Old DuPont designed, manufactured, marketed, and/or sold fluorochemicals and/or fluorosurfactants containing Long-Chain PFAS that were incorporated into AFFF products, and was in the business of designing, manufacturing, marketing, and/or selling fluorochemicals and/or fluorosurfactants with Long-Chain PFAS that were incorporated into AFFF products, and that were purchased and/or used by Valero or were stored and/or used on properties owned and/or operated by Valero.

5.     Old DuPont does business throughout the United States, including conducting business in Oklahoma, and is registered to do business as a foreign for-profit corporation in Oklahoma with the Secretary of State.

6.     Defendant The Chemours Company ("Chemours") is a Delaware corporation, with its main place of business located in Wilmington, Delaware. Chemours was a wholly owned subsidiary of Old DuPont. In 2015, Old DuPont spun off Chemours as a separate public entity and spun off its Performance Chemicals Business (as defined below) to Chemours, and Chemours assumed a significant portion of Old DuPont's environmental liabilities – including those relating

to Long-Chain PFAS – so that Chemours stands in the shoes of a Manufacturer Defendant (as defined below) for the claims made in this action.

7.      Chemours does business throughout the United States, including conducting business in Oklahoma, and is registered to do business as a foreign for-profit corporation in Oklahoma with the Secretary of State.

8.      Defendant DuPont de Nemours, Inc., formerly known as DowDuPont Inc. ("New DuPont") is a Delaware corporation with its principal place of business in Wilmington, Delaware. In 2015, after Old DuPont spun off Chemours, Old DuPont merged with The Dow Chemical Company ("Old Dow") and transferred Old DuPont's historic assets and liabilities to other entities, including New DuPont.  In connection with these transfers, on information and belief, New DuPont assumed certain Old DuPont liabilities – including those relating to Long-Chain PFAS.

9.      New DuPont does business throughout the United States, including conducting business in Oklahoma, and is registered to do business as a foreign for-profit corporation in Oklahoma with the Secretary of State.

10.     Defendant Corteva, Inc. ("Corteva") is a Delaware corporation with its principal place of business in Wilmington, Delaware.  In 2019, New DuPont spun off a new, publicly-traded company Corteva, which currently holds Old DuPont as a subsidiary.  In connection with these transfers, on information and belief, Corteva assumed certain Old DuPont liabilities – including those relating to Long-Chain PFAS.

11.     Corteva does business throughout the United States, including conducting business in Oklahoma, and is registered to do business as a foreign for-profit corporation in Oklahoma with the Secretary of State.

12. Defendant National Foam, Inc. ("National Foam") is a Delaware corporation with its principal place of business in Angier, North Carolina. National Foam designed, manufactured, marketed, and/or sold AFFF products to Valero. National Foam designed, manufactured, marketed, and/or sold AFFF products containing Long-Chain PFAS, and was in the business of designing, manufacturing, marketing, and/or selling AFFF products containing Long-Chain PFAS, that were purchased and/or used by Valero or were stored and/or used on properties owned and/or operated by Valero.

13. National Foam does business throughout the United States, including conducting business in Oklahoma.

14. Defendant Buckeye Fire Equipment Company ("Buckeye") is an Ohio corporation with its principal place of business in Kings Mountain, North Carolina. Buckeye designed, manufactured, marketed, and/or sold AFFF products containing Long-Chain PFAS, and was in the business of designing, manufacturing, marketing, and/or selling AFFF products containing Long-Chain PFAS, that were purchased and/or used by Valero or were stored and/or used on properties owned and/or operated by Valero.

15. Buckeye does business throughout the United States, including conducting business in Oklahoma.

16. Defendant Kidde-Fenwal, Inc. ("Kidde-Fenwal") is a Delaware corporation with its principal place of business in Farmington, Connecticut. On information and belief, Kidde-Fenwal is successor-in-interest to Kidde Fire Fighting, Inc. (f/k/a Chubb National Foam, Inc. f/k/a National Foam System, Inc.). Kidde-Fenwal and/or its predecessors designed, manufactured, marketed, and/or sold AFFF products containing Long-Chain PFAS, and was in the business of designing, manufacturing, marketing, and/or selling AFFF products with Long-Chain PFAS, that

were purchased, stored and/or used by Valero or were stored and/or used on properties owned and/or operated by Valero.

17.     Kidde-Fenwal does business throughout the United States, including conducting business in Oklahoma.

18.     Defendant Arkema Inc. ("Arkema") is a Pennsylvania corporation with its principal place of business in King of Prussia, Pennsylvania.  On information and belief, Arkema is a successor-in interest-to Atochem North America, Inc., Elf Atochem North America, Inc. and Atofina Chemicals, Inc.  Arkema and/or its predecessors designed, manufactured, marketed, and/or sold fluorosurfactants containing Long-Chain PFAS that were incorporated into AFFF products, and was in the business of designing, manufacturing, marketing, and/or selling fluorosurfactants with Long-Chain PFAS that were incorporated into AFFF products, and that were purchased and/or used by Valero or were stored and/or used on properties owned and/or operated by Valero.

19.     Arkema does business throughout the United States, including conducting business in Oklahoma, and is registered to do business as a foreign for-profit corporation in Oklahoma with the Secretary of State.

20.     3M, Old DuPont, Chemours, National Foam, Buckeye, Kidde-Fenwal and Arkema are collectively referred to herein as "Manufacturer Defendants."

21.     DOE Defendants 1 to 20 are other designers, manufacturers, marketers, distributors, and/or sellers of AFFF products containing Long-Chain PFAS, suppliers of fluorochemicals and/or fluorosurfactants containing Long Chain PFAS that were incorporated into AFFF products, and who were in the business of designing, manufacturing, marketing, and/or selling AFFF products containing Long-Chain PFAS and supplying fluorosurfactants, which were

sold to, stored, and/or used by Valero and/or were stored and/or used on properties owned and/or operated by Valero. When the DOE Defendants are identified, they will be added by name.

## II.
## <u>VENUE AND JURISDICTION</u>

22.      This action was initially filed on June 28, 2019 in the District Court in and for Carter County, State of Oklahoma [Case No. CJ-19-148]. As initially filed, venue was proper in Carter County, Oklahoma pursuant to 12 O.S. §§ 131, 132 because this is an action seeking recovery for damages to real property and improvements thereon that is located in Carter County and Murray County, Oklahoma. Moreover, Carter County is a county in which all or a substantial part of the events or omissions giving rise to the claims occurred, including the purchase of some of the products at issue.

23.      On July 11, 2019, 3M removed this action from the District Court in and for Carter County, State of Oklahoma to the United States District Court of Eastern Oklahoma [Case No. 19-cv-223] purportedly on the basis of diversity jurisdiction, 28 U.S.C. § 1332. Thereafter, on August 7, 2019, this case was transferred from the United States District Court of Eastern Oklahoma to the United States District Court of South Carolina, Charleston Division for coordinated pretrial proceedings with *In re: Aqueous Film-Forming Foams Products Liability Litigation*, MDL No. 2873. Plaintiff reserves all rights to seek an appropriate venue for the adjudication of its claims.

## III.
## <u>BACKGROUND FACTS</u>

24.      Per- and polyfluoroalkyl substances ("PFAS") are a family of synthetic man-made compounds containing bonded fluorine and carbon.

25.      A subset of PFAS compounds, often referred to as "Long-Chain PFAS" because of their structurally longer chain of bonded fluorine and carbon atoms, include or break down into

perfluorooctanoic acid ("PFOA") and perfluorooctanesulfonic acid ("PFOS"). Because of their waterproof, stain-resistant, non-stick properties, these Long-Chain PFAS have been used in numerous consumer products such as carpets, clothing, furniture fabrics, food packaging, cookware, and fire-fighting foams.

26.     Manufacturer Defendants designed, manufactured, marketed, and/or sold aqueous film-forming foam ("AFFF") products containing and/or breaking down into Long-Chain PFAS, including PFOS and/or PFOA, and /or designed, manufactured, marketed, supplied and/or sold fluorochemicals and/or fluorosurfactants containing and/or breaking down into Long-Chain PFAS, including PFOS and/or PFOA, that they knew and intended to be used in AFFF (collectively, "Manufacturer Defendants' AFFF Products"). All Manufacturer Defendants are, therefore, manufacturers of Manufacturer Defendants' AFFF Products.

27.     AFFF was developed to extinguish fires involving flammable substances that cannot be extinguished with water alone. AFFF is used as a foam solution intended to be sprayed directly onto fires and onto spilled fuel, in order to prevent fires. The foam solution is sprayed on the fire or fuel to provide a coat that blocks the supply of oxygen, generates a cooling effect, and creates an evaporation barrier. After the foam dissipates, a film forms to suffocate a fire.

28.     Having effective fire foam is vitally important to Valero and others in the petroleum industry.

29.     Refineries, bulk storage facilities, and terminals, such as those owned and operated by Valero, maintain and use AFFF to extinguish petroleum fires. These companies and facilities are the intended consumers of Manufacturer Defendants' AFFF Products.

30.     Valero owns and operates the Ardmore Refinery and associated facilities in Carter County, Oklahoma, where Manufacturer Defendants' AFFF Products were purchased, stored, and/or used (the "Sites").

31.     Oklahoma refineries are critical to the nation's petroleum refining and chemical products production.  The Oklahoma Energy Resources Board calls the oil and natural gas industry the economic engine of the state.   According to the United States Energy Information Administration, Oklahoma was the nation's sixth-largest crude oil producing state in 2017.  As of January 2018, Oklahoma had five operable petroleum refineries amounting to almost 3% of the total refinery processing capacity of the United States.

32.     At all relevant times, Manufacturer Defendants together controlled substantially all of the market in Oklahoma for Manufacturer Defendants' AFFF Products.  These companies designed, manufactured, marketed, and/or sold AFFF products, containing Long-Chain PFAS, and/or supplied fluorochemicals and/or fluorosurfactants, containing Long Chain PFAS incorporated into AFFF products, both individually and collectively through a variety of industry coalitions, trade associations, and groups in order to purposefully target Oklahoma as a market for Manufacturer Defendants' AFFF Products and to profit from that market.

33.     The United States Environmental Protection Agency ("USEPA") and state environmental agencies around the country are now aggressively investigating PFOA, PFOS, and other Long-Chain PFAS compounds and are in the process of establishing regulatory guidelines, Maximum Contaminant Levels ("MCLs"), and other cleanup standards for Long-Chain PFAS compounds.  USEPA is now moving forward with various regulatory actions, including listing PFOA and PFOS as hazardous substances under Comprehensive Environmental Response,

Compensation and Liability Act ("CERCLA"), creating MCL levels for drinking water, and/or creating remediation levels for PFOA, PFOS, and other Long-Chain PFAS compounds.

34.     USEPA also recently released a 72-page Action Plan, which "outlines concrete steps the agency is taking to address PFAS." The Action Plan describes near-term action taking place over the next two years, including moving forward with the MCL process outlined in the Safe Drinking Water Act for PFOA and PFOS, beginning the process of listing PFOA and PFOS in CERCLA, continuing enforcement actions and clarifying cleanup strategies, and expanding monitoring of PFAS in the environment, among other agency action.

35.     USEPA also recently sought public comment on a draft set of recommendations for cleaning up groundwater containing PFOA and PFOS to serve as a starting point for making site-specific cleanup decisions. That guidance provides recommendations on screening levels for investigation and preliminary remediation goals as initial targets for cleanup levels.

36.     The State of Oklahoma supports the "evaluation of which PFOA/PFOS compounds may need to be phased out of common usage" under the Toxic Substances Control Act. The State of Oklahoma also "support[s] consideration of making specific PFOA/PFOS compounds Superfund hazardous substances in order for USEPA and/or states to use Superfund authority to address contaminated groundwater and surface water."

37.     As a result of these and other regulatory actions, Valero has incurred and will continue to incur costs of addressing Long-Chain PFAS related to Manufacturer Defendants' AFFF Products.

38.     Manufacturer Defendants understood the true nature and properties of Long-Chain PFAS compounds for several decades before regulators, but actively concealed and misrepresented the nature of Long-Chain PFAS compounds to maximize their own profits. Further, Manufacturer

Defendants were aware of alternative product designs, though they have only relatively recently shifted their production of fire-fighting foams and related fluorochemicals and/or fluorosurfactants away from use of Long-Chain PFAS to shorter chain PFAS (with six carbon molecular structures or fewer).

39.    Manufacturer Defendants withheld short-chain PFAS development, and did not offer AFFF with short-chain PFAS as an alternative product for decades.

40.    Recently, state environmental agencies around the country have disclosed that Manufacturer Defendants have long possessed information regarding risks and potential impacts of Long-Chain PFAS and their products, yet withheld that information from their customers, regulators, and the public, made fraudulent representations regarding PFOA, PFOS, and/or their products, and sold their products knowing them to be unfit for their intended purpose.

41.    As a direct and proximate result of the conduct and products of the Manufacturer Defendants, Valero has incurred and will continue to incur substantial damages and costs associated with their products at the Sites, including but not limited to disposing of and replacing unused products containing Long-Chain PFAS, detecting, investigating, and remediating to various regulatory standards related to Manufacturer Defendants' AFFF Products. Manufacturer Defendants never revealed the contamination risks associated with their products and, merely because Valero and others purchased or used Manufacturer Defendants' AFFF Products exactly as intended and instructed at the Sites, Valero is now exposed to costs and damages to which it would not have otherwise been exposed. Valero did not know, and could not have known, the risks it was facing – of costs and damages they could incur – as a result of Manufacturer Defendants' AFFF Products, and their concealment and fraudulent practices.

42.     As a result of Defendants' actions, Valero has suffered and will continue to suffer irreparable damage and harm.  Valero has no adequate remedy absent an injunction.

43.     There is more than a reasonable probability that the injury sought to be prevented will be done if no injunction is issued.

44.     Accordingly, Valero brings this action for (1) compensatory damages consisting of general and site-specific costs and damages incurred and to be incurred by Valero including, but not limited to, costs to dispose of unused AFFF products; replacement costs; costs of identifying, investigating, monitoring, and/or remediating Manufacturer Defendants' AFFF Products and related costs; and real property environmental stigma/loss of market value damages, (2) punitive damages, (3) injunctive relief, requiring Defendants to perform investigative efforts, remedial and other work caused or necessitated by Manufacturer Defendants' AFFF Products, and (4) such other equitable relief as may be appropriate at law or equity under the facts established and proven by Plaintiff.

## IV.
## OLD DUPONT'S MULTI-STEP, FRAUDULENT
## SCHEME TO ISOLATE ITS VALUABLE TANGIBLE ASSETS
## FROM ITS PFAS LIABILITIES AND HINDER CREDITORS

45.     Old DuPont has substantial liabilities related to Long-Chain PFAS, which arise from its use and release of these chemicals at various of its plants around the country, as well as its manufacture and/or sale of products that contain Long-Chain PFAS for AFFF.  However, Old DuPont has sought to insulate itself from billions of dollars in these liabilities.

46.     For decades, Old DuPont used and/or manufactured Long-Chain PFAS at chemical plants in West Virginia, New Jersey and North Carolina.  Old DuPont was sued multiple times by landowners and neighbors of those plants for liabilities arising out of Long-Chain PFAS.  Old

DuPont expended hundreds of millions of dollars litigating and settling those lawsuits. Old DuPont thus knew, or reasonably should have known, that it faced billions of dollars in liabilities related to Long-Chain PFAS.

47.     In light of this significant exposure, on information and belief, by 2013, Old DuPont's management began to consider restructuring the company in order to, among other things, avoid responsibility for the widespread environmental harm that Old DuPont's Long-Chain PFAS had caused, and shield billions of dollars in assets from these substantial liabilities. Old DuPont referred to this initiative internally as "Project Beta."

48.     On information and belief, Old DuPont contemplated various restructuring opportunities, including potential merger structures. In or about 2013, Old DuPont and Old Dow began discussions about a possible "merger of equals."

49.     On information and belief, Old DuPont recognized that neither Old Dow, nor any other rational merger partner, would agree to a transaction that would result in exposing Old Dow, or any other merger partner, to the substantial Long-Chain PFAS liabilities that Old DuPont faced.

50.     Accordingly, Old DuPont's management decided to pursue a corporate restructuring strategy specifically designed to isolate Old DuPont's massive legacy liabilities from its valuable tangible assets in order to shield those assets from creditors, and entice Old Dow to pursue the proposed merger.

51.     Old DuPont engaged in a three-part restructuring plan, further explained below.

52.     The first step in Old DuPont's plan was to transfer its Performance Chemicals business (which included the manufacture of products that involved the use of PFOA and other

PFAS) (the "Performance Chemicals Business") into its wholly-owned subsidiary, Chemours. And then, in July 2015, Old DuPont "spun-off" Chemours as a separate public entity and saddled Chemours with Old DuPont's massive legacy liabilities (the "Chemours Spinoff").

53.     Old DuPont knew that Chemours was undercapitalized and could not satisfy the massive liabilities that it caused Chemours to assume. Old DuPont also knew that the Chemours Spinoff alone would not isolate its own assets from its Long-Chain PFAS liabilities, and that Old DuPont still faced direct liability for its own conduct.

54.     Accordingly, Old DuPont moved on to the next step of its plan, designed to further distance itself from the exposure it had created over its decades-long bad conduct with regard to Long-Chain PFAS.

55.     The second step involved Old DuPont and Old Dow entering into an "Agreement and Plan of Merger" in December 2015, pursuant to which Old DuPont and Old Dow merged with subsidiaries of a newly-formed holding company, DowDuPont, Inc. ("DowDuPont"), which was created for the sole purpose of effectuating the merger. Old DuPont and Old Dow became subsidiaries of DowDuPont.

56.     Then, through a series of subsequent agreements, DowDuPont engaged in numerous business segment and product line "realignments" and "divestitures."

57.      The net effect of these transactions was to transfer, either directly or indirectly, a substantial portion of Old DuPont's assets to DowDuPont.

58.     The third step involved DowDuPont spinning off two, new, publicly-traded companies: (i) Corteva, which currently holds Old DuPont as a subsidiary, and (ii) Dow, Inc.

("New Dow") which currently holds Old Dow. DowDuPont was then renamed DuPont de Nemours, Inc., *i.e.*, "New DuPont."

59.     As a result of these transactions, between December 2014 (pre-Chemours Spinoff) and December 2019 (post-Dow merger), the value of Old DuPont's tangible assets decreased by $20.85 billion.

60.     New DuPont and New Dow now hold the vast majority of the tangible assets that Old DuPont formerly owned.

61.     Many of the details about these transactions are hidden from the public in confidential schedules and exhibits to the various restructuring agreements.  On information and belief, Old DuPont, New DuPont, New Dow, and Corteva have intentionally buried these details in an attempt to hide from creditors, like Valero, where Old DuPont's valuable assets went and the inadequate consideration that Old DuPont received in return.

**Step 1: The Chemours Spinoff**

62.     In February 2014, Old DuPont formed Chemours as a wholly-owned subsidiary. Chemours was originally incorporated on February 18, 2014 under the name "Performance Operations, LLC."

63.     On or about April 15, 2014, the company was renamed "The Chemours Company, LLC," and on April 30, 2015, it was converted from a limited liability company to a corporation named "The Chemours Company."

64.     Prior to July 1, 2015, Chemours was a wholly-owned subsidiary of Old DuPont. On July 1, 2015, Old DuPont completed the spinoff of its Performance Chemicals Business, and Chemours became a separate, publicly traded entity, *i.e.,* the "Chemours Spinoff."

65.     At the time of the spinoff, the Performance Chemicals Business consisted of Old DuPont's Titanium Technologies, Chemical Solutions and Fluorochemicals segments.

66.     The Performance Chemicals Business included the fluoroproducts and chemical solutions businesses that had manufactured, used, and discharged Long-Chain PFAS into the environment.

67.     Prior to the Chemours Spinoff, Chemours was a wholly-owned subsidiary of Old DuPont, and its Board of Directors had three members, all of whom were Old DuPont employees.

68.     On June 19, 2015, a fourth member of the Board was appointed, and on information and belief, this fourth member had served as a member of Old DuPont's Board of Directors from 1998 to 2015.

69.     On July 1, 2015, effective immediately prior to the Chemours Spinoff, the size of the Chemours Board of Directors was expanded to eight members. The three initial Old DuPont employees resigned from the Board, and to fill the vacancies created thereby, seven new members were appointed.

70.     To effectuate the Chemours Spinoff, Old DuPont and Chemours entered into the June 26, 2015 Separation Agreement (the "Chemours Separation Agreement").

71.     Pursuant to the Chemours Separation Agreement, Old DuPont agreed to transfer to Chemours all businesses and assets related to the Performance Chemicals Business, including 37 active chemical plants.

72.     Old DuPont completed a significant internal reorganization prior to the Chemours Spinoff, such that all of the assets that Old DuPont deemed to be part of the Performance Chemicals Business would be transferred to Chemours.

73.     At the same time, Chemours accepted a broad assumption of liabilities for Old DuPont's historical use, manufacture, and discharge of Long-Chain PFAS, although the specific details regarding the nature, probable maximum loss value, and anticipated timing of the liabilities that Chemours assumed are set forth in the non-public schedules and exhibits to the Chemours Separation Agreement.

74.     Notwithstanding the billions of dollars in Long-Chain PFAS liabilities that Chemours would face, on July 1, 2015, Chemours transferred to Old DuPont approximately $3.4 billion as a cash dividend, along with a "distribution in kind" of promissory notes with an aggregate principal amount of $507 million.

75.     Thus, in total, Chemours distributed $3.9 billion to Old DuPont.  Chemours funded these distributions by entering into approximately $3.995 billion of financing transactions, including senior secured term loans and senior unsecured notes, on May 12, 2015.  Also, Chemours distributed approximately $3.0 billion in common stock to Old DuPont shareholders on July 1, 2015 (181 million shares at $16.51 per share price).

76.     Accordingly, most of the valuable assets that Chemours may have had at the time of the Chemours Spinoff were unavailable to creditors with current or future Long-Chain PFAS claims, and Old DuPont stripped Chemours' value for itself and its shareholders.  In total, Chemours transferred almost $7 billion in stock, cash and notes to Old DuPont and its shareholders.  Old DuPont, however, only transferred $4.1 billion in net assets to Chemours.  And, Chemours assumed billions of dollars of Old DuPont's Long-Chain PFAS and other liabilities.

77.     In addition to the assumption of such liabilities, the Chemours Separation Agreement required Chemours to provide broad indemnification to Old DuPont in connection with these liabilities, which is uncapped and does not have a survival period.

78.     The Chemours Separation Agreement requires Chemours to indemnify Old DuPont against, and to assume for itself: all "Chemours Liabilities," which is defined broadly to include, among other things, "any and all Liabilities relating . . .  primarily to, arising primarily out of or resulting primarily from, the operation or conduct of the Chemours Business, as conducted at any time prior to, at or after the Effective Date . . . including . . . any and all Chemours Assumed Environmental Liabilities . . . ," which include Old DuPont's historic liabilities relating to and arising from its decades of emitting Long-Chain PFAS into the environment.

79.     The Chemours Separation Agreement also requires Chemours to indemnify Old DuPont against, and assume for itself, the Chemours Liabilities regardless of: (i) when or where such liabilities arose; (ii) whether the facts upon which they are based occurred prior to, on, or subsequent to the effective date of the spinoff; (iii) where or against whom such liabilities are asserted or determined; (iv) whether arising from or alleged to arise from negligence, gross negligence, recklessness, violation of law, fraud or misrepresentation by any member of the Old

DuPont group or the Chemours group; (v) the accuracy of the maximum probable loss values assigned to such liabilities; and (vi) which entity is named in any action associated with any liability.

80.     The Chemours Separation Agreement also requires Chemours to indemnify Old DuPont from, and assume all, environmental liabilities that arose prior to the spinoff if they were "primarily associated" with the Performance Chemicals Business.

81.     Such liabilities were deemed "primarily associated" if Old DuPont reasonably determined that 50.1% of the liabilities were attributable to the Performance Chemicals Business.

82.     Among the environmental liabilities assumed by Chemours was litigation over benzene, a carcinogen released from some of Old DuPont's plants.

83.     In December 2015, a Texas jury awarded $8.4 million to a painter who developed leukemia after using paints with benzene for years, with at least 27 more benzene cases pending as of September 30, 2016.

84.     Chemours is also obligated to clean-up Pompton Lakes, New Jersey, where Old DuPont manufactured explosives from 1902 to 1994, and where lead salts, mercury, volatile organic compounds, explosive powders, chlorinated solvents, and detonated blasting caps still contaminate groundwater and soil.  Chemours' filings with the U.S. Securities and Exchange Commission ("SEC") estimate that the remediation, which began in 1985, may cost as much as $119 million to complete.

85.     Chemours also agreed to use its best efforts to be fully substituted for Old DuPont with respect to "any order, decree, judgment, agreement or Action with respect to Chemours Assumed Environmental Liabilities . . . ."

86.     In addition to the assumption of such liabilities, Chemours also provided broad indemnification to Old DuPont in connection with these liabilities, which is uncapped and does not have a survival period.

87.     The effect of creation of Chemours was to segregate a large portion of Old DuPont's environmental liabilities, including liabilities related to its Long-Chain PFAS chemicals and products.

88.     The consolidation of Old DuPont's performance chemical liabilities has potentially limited the availability of funds arising out of Old DuPont's liability.

89.     As Chemours explained in its November 2016 SEC filing: "[s]ignificant unfavorable outcomes in a number of cases in the [Ohio] MDL could have a material adverse effect on Chemours consolidated financial position, results of operations or liquidity."

90.     On February 13, 2017, Old DuPont and Chemours, agreed to pay $670.7 million to resolve the approximately 3,500 then-pending cases in the Ohio MDL.

91.     Chemours also agreed to pay $25 million for future PFOA costs not covered by the settlement for each of the next five years (up to an additional $125 million).

92.     Old DuPont also agreed to cover additional amounts up to $25 million for five years.

93.    At the time of the transfer of its Performance Chemicals Business to Chemours, Old DuPont had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding Old DuPont's liability for damages and injuries from the manufacture of Long-Chain PFAS compounds and products that contain Long-Chain PFAS compounds.

94.    Notably, Chemours sued Old DuPont in Delaware state court in 2019, alleging, among other things, that if (i) the full value of Old DuPont's Long-Chain PFAS liabilities were properly estimated, and (ii) the Court does not limit Chemours' liability that the Chemours Separation Agreement imposes, then Chemours would have been insolvent at the time of the Chemours Spinoff.

95.    There was no meaningful, arms-length negotiations of the Chemours Separation Agreement.

96.    In its Delaware lawsuit, Chemours alleges that Old DuPont refused to allow any procedural protections for Chemours in the negotiations, and Old DuPont and its outside counsel prepared all the documents to effectuate the Chemours Spinoff. Indeed, during the period in which the terms of commercial agreements between Chemours and Old DuPont were negotiated, Chemours did not have an independent board of directors or management independent of Old DuPont.

97.    Although Chemours had a separate board of directors, Old DuPont employees controlled the Chemours board. Indeed, when the Chemours Separation Agreement was signed, Chemours was a wholly-owned subsidiary of Old DuPont, and the Chemours board consisted of three Old DuPont employees and one former, long-standing member of the Old DuPont board.

98.     Chemours' independent board of directors, newly appointed on July 1, 2015, immediately prior to the Chemours Spinoff, did not participate in the negotiations of the terms of the separation.

99.     It is apparent that Old DuPont's goal with respect to the Chemours Spinoff was to segregate a large portion of Old DuPont's legacy environmental liabilities, including liabilities related to its Long-Chain PFAS chemicals and products, and in so doing, shield Old DuPont's assets from any financial exposure associated therewith.

100.    Not surprisingly, given Old DuPont's extraction of nearly $4 billion from Chemours immediately prior to the Chemours Spinoff, Chemours was thinly capitalized and unable to satisfy the substantial liabilities that it assumed from Old DuPont.  Indeed, Chemours disclosed in public SEC filings that its "significant indebtedness" arising from its separation from Old DuPont restricted its current and future operations.

101.    Shortly after the Chemours Spinoff, market analysts described Chemours as "a bankruptcy waiting to happen" and a company "purposely designed for bankruptcy."

102.    At the end of December 2014, Chemours reported it had total assets of $5.959 billion and total liabilities of $2.286 billion. At the end of 2015, following the Chemours Spinoff, Chemours reported that it had total assets of $6.298 billion and total liabilities of $6.168 billion as of December 31, 2015, yielding total net worth of $130 million.

103.    Removing Chemours' goodwill and other intangibles of $176 million yields a tangible net worth of negative $46 million (that is, Chemours' liabilities were greater than its tangible assets).  According to unaudited pro forma financial statements, as of March 31, 2015

(but giving effect to all of the transactions contemplated in the Chemours Spinoff), Chemours had total assets of $6.4 billion and total liabilities of $6.3 billion.

104.    Chemours also reported that these liabilities included $454 million in "other accrued liabilities," which in turn included $11 million for accrued litigation and $68 million for environmental remediation.  Chemours also had $553 million in "other liabilities," which included $223 million for environmental remediation and $58 million for accrued litigation.

105.    Chemours significantly underestimated its liabilities, including the liabilities that it had assumed from Old DuPont with respect to Long-Chain PFAS, and which Old DuPont and Chemours knew or should have known be tens of billions of dollars.  Had Chemours taken the full extent of Old DuPont's legacy liabilities into account, as it should have done, it would have had negative equity (that is, total liabilities that are greater than total assets), not only on a tangible basis, but also on a total equity basis, and, Chemours would have been rendered insolvent at the time of the Chemours Spinoff.

### Step 2: The Old Dow/Old DuPont "Merger"

106.    After the Chemours Spinoff, Old DuPont took the untenable position that it was somehow no longer responsible for the widespread Long-Chain PFAS contamination that it had caused over several decades. Old DuPont publicly claimed that the Long-Chain PFAS liabilities associated with the Performance Chemicals Business that Old DuPont had transferred to Chemours rested solely with Chemours, and not with Old DuPont.

107.    Of course, Old DuPont could not contractually discharge all of its historical liabilities through the Chemours Spinoff, and Old DuPont remained liable for the liabilities it had caused, and that Chemours had assumed.

108.    Old DuPont knew that it could not escape liability and would still face exposure for Long-Chain PFAS liabilities, including for potentially massive punitive damages. So Old DuPont moved to the next phase of its fraudulent scheme.

109.    On December 11, 2015, less than six months following the Chemours Spinoff, Old DuPont and Old Dow announced that their respective boards had approved an agreement "under which the companies [would] combine in an all-stock merger of equals" and that the combined company would be named DowDuPont, Inc. ("Dow-DuPont Merger"). The companies disclosed that they intended to subsequently separate the combined companies' businesses into three publicly-traded companies through further spinoffs, each of which would occur 18 to 24 months following the closing of the merger.

110.    To effectuate the transaction, Old DuPont and Old Dow entered into an Agreement and Plan of Merger (the "Dow-DuPont Merger Agreement") that provided for: (i) the formation of a new holding company – Diamond-Orion HoldCo, Inc., later named DowDuPont, and then renamed DuPont de Nemours, Inc, *i.e.*, "New DuPont," and (ii) the creation of two new merger subsidiaries into which Old Dow and Old DuPont each would merge.

111.    Upon the closing of the Dow-DuPont Merger, Old Dow merged into one merger subsidiary, and Old DuPont merged into the other merger subsidiary. Thus, as a result of the merger, and in accordance with the Dow-DuPont Merger Agreement, Old Dow and Old DuPont each became wholly-owned subsidiaries of DowDuPont.

112.    Although Old DuPont and Old Dow referred to the transaction as a "merger of equals," the two companies did not actually merge at all, because doing so would have infected Old Dow with all of Old DuPont's historical Long-Chain PFAS liabilities. Rather, Old DuPont

-23-

and Old Dow became affiliated sister companies that were each owned by the newly formed DowDuPont (*i.e.*, New DuPont).

113.  The below image reflects the corporate organization following the "merger":



**Step 3: The Shuffling, Reorganization, and Transfer of Valuable Assets Away from Old DuPont and Separation of Corteva and New Dow**

114.  Following the Dow-DuPont Merger, DowDuPont (*i.e.*, New DuPont) underwent a significant internal reorganization, and engaged in numerous business segment and product line "realignments" and "divestitures." The net effect of these transactions has been the transfer, either directly or indirectly, of a substantial portion of Old DuPont's assets out of the company.

115.  While, again, the details of these transactions remain hidden from Valero and other creditors, it is apparent that the transactions were intended to frustrate and hinder creditors with claims against Old DuPont, including with respect to its substantial Long-Chain PFAS liabilities.

The significant internal reorganization instituted by DowDuPont (*i.e.*, New DuPont) was in preparation for the conglomerate being split into three separate, publicly-traded companies.

116.    Old DuPont's assets, including its remaining business segments and product lines, were transferred either directly or indirectly to DowDuPont (*i.e.*, New DuPont), which reshuffled the assets and combined them with the assets of Old Dow, and then reorganized the combined assets into three distinct divisions: (i) the "Agriculture Business," (ii) the "Specialty Products Business," and (iii) the "Material Sciences Business."

117.    While the precise composition of these divisions, including many details of the specific transactions, the transfer of business segments, and the divestiture of product lines during this time, are not publicly available, it is apparent that Old DuPont transferred a substantial portion of its valuable assets to DowDuPont (*i.e.*, New DuPont), for far less than the assets were worth.

118.    Once the assets of Old DuPont and Old Dow were combined and reorganized, DowDuPont (*i.e.*, New DuPont) incorporated two new companies to hold two of the three newly formed business lines: (i) Corteva, which became the parent holding company of Old DuPont, which in turn holds the Agriculture Business, and (ii) New Dow, which became the parent holding company of Old Dow, and which holds the Materials Science Business. DowDuPont (*i.e.*, New DuPont) retained the Specialty Products Business, and prepared to spin off Corteva and New Dow into separate, publicly traded companies.

119.    The below graph depicts the structure of DowDuPont after the internal reorganization and realignment:



120.    The mechanics of the separations are governed by the April 1, 2019 Separation and Distribution Agreement among Corteva, New Dow and DowDuPont (*i.e.*, New DuPont) (the "DowDuPont Separation Agreement").

121.    The agreement generally allocates the assets primarily related to the respective business divisions to Corteva (Agriculture Business), New Dow (Materials Science Business) and New DuPont (Specialty Products Business), respectively.  New DuPont also retained several "non-core" business segments and product lines that once belonged to Old DuPont.

122.    Similarly, Corteva, New Dow and New DuPont each retained the liabilities primarily related to the business divisions that they retained, *i.e.*, (i) Corteva retained and assumed the liabilities related to the Agriculture Business, (ii) New DuPont retained and assumed the

liabilities related to the Specialty Products Business, and (iii) New Dow retained and assumed the liabilities related to the Materials Science Business.

123.    Corteva and New DuPont also assumed direct financial liability of Old DuPont that was not related to the Agriculture, Material Science or Specialty Products Businesses, including, on information and belief, the Long-Chain PFAS liabilities. These assumed Long-Chain PFAS liabilities are allocated on a pro rata basis between Corteva and New DuPont pursuant to the DowDuPont Separation Agreement, such that, after both companies have satisfied certain conditions, future liabilities are allocated 71% to New DuPont and 29% to Corteva.

124.    This "allocation" applies to Old DuPont's legacy liabilities for Long-Chain PFAS contamination and its former Performance Chemicals Business, including Valero's claims in this case.

125.    While New DuPont and Corteva have buried the details in non-public schedules, on information and belief, New DuPont and Corteva each assumed these liabilities under the DowDuPont Separation Agreement, along with other liabilities related to Old DuPont's discontinued and divested businesses. Valero can therefore bring claims against New DuPont and Corteva directly for Old DuPont's Long-Chain PFAS liabilities.

126.    The separation of New Dow was completed on or about April 1, 2019, when DowDuPont (*i.e.*, New DuPont) distributed all of New Dow's common stock to DowDuPont stockholders as a pro rata dividend. New Dow now trades on the New York Stock Exchange ("NYSE") under Old Dow's stock ticker "DOW."

127.    On or about May 2, 2019, DowDuPont (*i.e.*, New DuPont) consolidated the Agricultural Business line into Old DuPont, and then, on or about May 31, 2019, it "contributed" Old DuPont to Corteva. The following day, on June 1, 2019, DowDuPont (*i.e.*, New DuPont) spun off Corteva as an independent public company.

128.    Corteva now holds 100% of the outstanding common stock of Old DuPont.  Corteva now trades on the NYSE under the stock ticker "CTVA."

129.    The separation of Corteva was completed on or about June 1, 2019, when DowDuPont distributed all of Corteva's common stock to DowDuPont (*i.e.*, New DuPont) stockholders as a pro rata dividend.

130.    The corporate structures of New Dow and Old Dow, and Corteva and Old DuPont, respectively, following the separations are depicted below:



131.    Also, on or about June 1, 2019, DowDuPont changed its registered name to Du Pont de Nemours Inc. (*i.e.*, New DuPont).

**The Effect of the Years-Long Scheme To
Defraud Valero and Other Creditors and Avoid
Financial Responsibility for Legacy Liabilities**

132.    The net results of these transactions was to strip away valuable tangible assets from Old DuPont, and transfer those assets to New DuPont and Corteva for far less than the assets are worth.

133.    Old DuPont estimated that the Dow-DuPont Merger created "goodwill" worth billions of dollars. When the Corteva separation was complete, a portion of this "goodwill" was

assigned to Old DuPont in order to prop up its balance sheet. But, in reality, Old DuPont was left with substantially fewer tangible assets than it had prior to the restructuring.

134.    In addition, Old DuPont owes a debt to Corteva of approximately $4 billion. Recent SEC filings demonstrate the substantial deterioration of Old DuPont's finances and the drastic change in its financial condition before and after the above transactions.

135.    For example, for the fiscal year ended 2014, prior to the Chemours Spinoff, Old DuPont reported $3.6 billion in net income and $3.7 billion in cash provided by operating activities. For the fiscal year ended 2019, just months after the Corteva separation, however, Old DuPont reported a net loss of negative $1 billion and only $996 million in cash provided by operating activities. That is a decrease of 128% in net income and a decrease of 73% in annual operating cash flow.

136.    Additionally, Old DuPont reported a significant decrease in Income From Continuing Operations Before Income Taxes ("EBT"). Old DuPont reported $4.9 billion in EBT for the period ending December 31, 2014. For the period ending December 31, 2019, Old DuPont reported EBT of negative $422 million.

137.    The value of Old DuPont's tangible assets further underscores Old DuPont's precarious financial situation. For the fiscal year ended 2014, prior to the Chemours Spinoff, Old DuPont owned nearly $41 billion in tangible assets. For the fiscal year ended 2019, Old DuPont owned just under $21 billion in tangible assets.

138.    That means in the five-year period over which the restructuring occurred, when Old DuPont knew that it faced billions of dollars in Long-Chain PFAS liabilities, Old DuPont transferred or divested approximately half of its tangible assets—totaling $20 billion.

139.    As of September 2019, just after the Corteva spinoff, Old DuPont reported $43.251 billion in assets. But almost $21.835 billion of these assets were comprised of intangible assets, including "goodwill" from its successive restructuring activities.

140.    At the same time, Old DuPont reported liabilities totaling $22.060 billion. Thus, when the Corteva spinoff was complete, Old DuPont's tangible net worth (excluding its intangible assets) was negative $644 million.

141.    Old DuPont's financial condition has continued to deteriorate. By fiscal year ended 2019, Old DuPont reported $42.397 billion in total assets, half of which (or $21.653 billion) are intangible assets. Old DuPont's reported liabilities for the same period totaled $21.869 billion.

142.    Old DuPont's tangible net worth between September 30, 2019 and December 31, 2019 declined even further, whereby Old DuPont ended fiscal year 2019 with tangible net worth of negative $1.125 billion.

143.    In addition, Valero cannot take comfort in the "allocation" of liabilities to New DuPont and Corteva. Neither of those Defendants has publicly conceded that they assumed Old DuPont's historical Long-Chain PFAS liabilities. And it is far from clear that either entity will be able to satisfy any judgment in this case.

144.    Indeed, New DuPont—to which 71% of Long-Chain PFAS liabilities are "allocated" under the DowDuPont Separation Agreement once certain conditions are satisfied—is

in the process of divesting numerous business segments and product lines, including tangible assets that it received from Old DuPont, and for which Old DuPont has received less than reasonably equivalent value.

145.    New DuPont has received or will receive significant proceeds on the sales of Old DuPont's former business segments and product lines.

146.    In September 2019, New DuPont sold the Sustainable Solutions business for $28 million to Gyrus Capital.

147.    On or about December 15, 2019, New DuPont agreed to sell the Nutrition and Biosciences business to International Flavors & Fragrances for $26.2 billion.

148.    In March 2020, New DuPont completed the sale of Compound Semiconductor Solutions for $450 million to SK Siltron.

149.    In addition, New DuPont has issued Notices of Intent to Sell relating to: six non-core segments (estimated by market analysts at approximately $4.5 billion), as well as the Transportation and Industrial Chemicals business, which had reported net sales revenue in 2019 of $4.95 billion and estimated annual operating earnings before interest, taxes, depreciation, and amortization of $1.3 billion.

150.    Old DuPont's parent holding company, Corteva—to which 29% of Long-Chain PFAS liabilities are "allocated" under the DowDuPont Separation Agreement once certain conditions are satisfied—holds as its primary tangible asset the intercompany debt owed to it by its wholly-owned subsidiary, Old DuPont. But Old DuPont does not have sufficient tangible assets to satisfy this debt obligation.

# V.
# CAUSES OF ACTION

## A.     Strict Products Liability for Defective Design

151.     Valero realleges and incorporates paragraphs 1 through 150 as if fully stated herein.

152.     Manufacturer Defendants' AFFF Products containing or breaking down into Long-Chain PFAS, including PFOS and/or PFOA, were designed, manufactured, marketed and sold by Manufacturer Defendants.

153.     At the time Manufacturer Defendants' AFFF Products in question were sold, Manufacturer Defendants were in the business of designing, manufacturing, marketing, selling, and/or incorporating into other products chemicals such as those in question here.

154.     At the time Manufacturer Defendants' AFFF Products in question were designed, manufactured, marketed, and sold by them, they were defective in design and not reasonably safe as designed at the time they left Manufacturer Defendants' possession and control.  The defect in Manufacturer Defendants' AFFF Products made Manufacturer Defendants' AFFF Products unreasonably dangerous to Plaintiff and Plaintiff's property.

155.     At the time Manufacturer Defendants' AFFF Products in question left their possession, there were economically and technologically feasible safer alternative designs that would have prevented or significantly reduced the risk of Plaintiff's damages without substantially impairing their products' utility.

156.     The defective and unreasonably dangerous condition of the Manufacturer Defendants' AFFF Products has caused and will continue to cause injury to Plaintiff. Manufacturer Defendants are strictly liable for all such damages.

157.     At the time the Manufacturer Defendants' AFFF Products were used, they were in substantially the same condition as they were when placed into the stream of commerce.  No

material alterations were made to the products. The Manufacturer Defendants' AFFF Products were in the same or substantially similar condition as when they left the control of Manufacturer Defendants.

158.    Valero is an entity who used, consumed, could have reasonably been affected by, and was affected by the Manufacturer Defendants' AFFF Products. Valero has suffered and will continue to incur costs relating to disposal and replacement of unused products and detecting, investigating, monitoring, and addressing impacts from the use of Manufacturer Defendants' AFFF Products, including PFOS and/or PFOA. Likewise, Valero has suffered and will continue to suffer property damages in terms of costs of abatement and/or loss of market value due to Manufacturer Defendants' AFFF Products' contamination on, under and from the Sites. Manufacturer Defendants' AFFF Products have caused damage to property other than Manufacturer Defendants' AFFF Products. That damage was directly caused by the defect in Manufacturer Defendants' AFFF Products. Manufacturer Defendants' AFFF Products are the cause of Plaintiff's injury. Manufacturer Defendants are strictly liable for all such damages.

159.    On information and belief, New DuPont and Corteva assumed Old DuPont's liability for damages described above.

## B.    Strict Products Liability for Failure to Warn

160.    Plaintiff realleges and incorporates paragraphs 1 through 159 as if fully stated herein.

161.    Manufacturer Defendants' AFFF Products containing or breaking down into Long-Chain PFAS, including PFOS and/or PFOA, were not reasonably safe at the time they left their control because those products lacked adequate warnings.

162.    At the time Manufacturer Defendants manufactured, marketed, and sold their products containing or breaking down into Long-Chain PFAS, including PFOS and/or PFOA, they

knew their products were not safe because Long-Chain PFAS would need to be detected, investigated, monitored, addressed, and/or removed from the soil and groundwater, if the products were used as intended. Valero has been so injured. Manufacturer Defendants' AFFF Products involved a risk of harm to persons and property when they are used by an ordinary user in the way that they were intended to be sued and in a way that the Manufacturer Defendants could have reasonably foreseen they would be used.

163.    Despite Manufacturer Defendants' knowledge of attendant risks, they failed to provide adequate warnings and instructions that their products, if used as intended, would cause such damages. Manufacturer Defendants also failed to provide adequate warnings and instructions concerning the precautions that must be taken when using their products in order to eliminate or limit the release of Long-Chain PFAS contamination when used as intended. Manufacturer Defendants' AFFF Products did not have adequate warning of their dangerous characteristics or adequate instructions for their safe use that are sufficient to inform an ordinary use of the risk of harm.

164.    Moreover, Manufacturer Defendants continued to conceal the dangers of their products after they manufactured, marketed, and sold such products.

165.    Without adequate warnings or instructions, Manufacturer Defendants' AFFF Products were unsafe to an extent beyond that which would be contemplated by an ordinary person. The risk of harm is not one that an ordinary user would reasonably expected. The particular danger would not have been apparent to an ordinary user from the nature of the products themselves or from other information known to the user.

166.    Manufacturer Defendants' conduct and Long-Chain PFAS, including PFOS and/or PFOA, released by their products at the Sites caused and continues to cause injury to Valero.

167.    Valero has suffered and will continue to incur costs relating to disposal and replacement of unused products and detecting, investigating, monitoring, and addressing impacts from the use of Manufacturer Defendants' AFFF Products, including PFOS and/or PFOA. Likewise, Valero has suffered and will continue to suffer property damages in terms of costs of abatement and/or loss of market value due to Manufacturer Defendants' AFFF Products' contamination on, under and from the Sites.  Manufacturer Defendants are strictly liable for all such damages.

168.    On information and belief, New DuPont and Corteva assumed Old DuPont's liability for damages described above.

**C.     Negligence**

169.    Plaintiff realleges and incorporates paragraphs 1 through 168 as if fully stated herein.

170.    Manufacturer Defendants committed acts of omission and commission, which collectively constituted negligence, which were a direct, proximate, and but-for cause of the damages and injuries to Plaintiff.

171.    Manufacturer Defendants failed to exercise ordinary care because a reasonably careful company that learned of risks of the nature and kind alleged here would not manufacture or market that product, would warn of its risks and properties (even after it left its control), or would take steps to enhance the safety and/or reduce the impacts and risk of damage from its product.

172.    Manufacturer Defendants owed Valero a duty of care in the manufacture, marketing, and sale of Manufacturer Defendants' AFFF Products containing Long-Chain PFAS, including PFOS and/or PFOA, because it was foreseeable to them that their products, when used as intended, would cause damage to property and consumers such as Valero.

173.    Manufacturer Defendants' negligent conduct in creating, exacerbating, and concealing the presence and risks of Long-Chain PFAS, including PFOS and/or PFOA, released from their products, caused and continues to cause damages to Valero.

174.    Valero has incurred and will continue to incur costs associated with Manufacturer Defendants' AFFF Products.  Manufacturer Defendants are liable to Valero for all such damages.

175.    Likewise, Valero have suffered and will continue to suffer property damages in terms of costs of abatement and/or loss of market value due to Manufacturer Defendants' AFFF Products' contamination on, under, and from the Sites.

176.    On information and belief, New DuPont and Corteva assumed Old DuPont's liability for damages described above.

**D.    Gross Negligence**

177.    Plaintiff realleges and incorporates paragraphs 1 through 176 as if fully stated herein.

178.    Manufacturer Defendants committed gross negligence, which was a direct, proximate, and but-for cause of the damages and injuries to Plaintiff and for which Plaintiff is entitled to recover punitive damages.

179.    Manufacturer Defendants' acts and omissions involved an extreme degree of risk and recklessness, considering the probability and magnitude of potential harm to others.

180.    Even though Manufacturer Defendants were aware of these dangers, they acted recklessly and with conscious disregard to the rights, safety and welfare of Plaintiff and others by, among other things, refusing to incorporate safer alternative designs and provide warnings and misleading the Plaintiff and the consuming public about their products.

181. On information and belief, New DuPont and Corteva assumed Old DuPont's liability for damages described above.

**E.    Actual Fraud, Constructive Fraud, and Deceit**

182. Plaintiff realleges and incorporates paragraphs 1 through 181 as if fully stated herein.

183. In the course of manufacturing, marketing, and selling their products, Manufacturer Defendants studied and had knowledge of the impacts of Long-Chain PFAS, including PFOS and/or PFOA, that they knew was unavailable to the Plaintiff and the rest of the general public. Manufacturer Defendants deliberately concealed information regarding the contamination effect of their products that might impair their lucrative business. The concealed information were material facts. Manufacturer Defendants had a duty to speak.

184. The Long-Chain PFAS chemicals in Manufacturer Defendants' AFFF Products have unique bioaccumulative properties and characteristics. Manufacturer Defendants were acutely aware of these properties, which were known only to them. Manufacturer Defendants knew the Manufacture Defendants' AFFF Products would produce damages to the product users, yet continued to actively market the sale of their products.

185. Indeed, Manufacturer Defendants knew their products were unsafe to an extent beyond that which would be contemplated by an ordinary person because of the information only available to and deliberately withheld by them.

186. While omitting information that may deter a sale, Manufacturer Defendants also made materially false statements designed to further the sales of their products to consumers, including Valero. Manufacturer Defendants' statements were material representations and Manufacturer Defendants knew those statements were false or made them with recklessly without knowledge of the truth. For example, with knowledge to the contrary, 3M issued a statement in

2000 that its products were safe. Manufacturer Defendants also directly – and through a trade group established to dispel concerns the USEPA had raised about their products – published false information about Manufacturer Defendants' AFFF Products not containing or breaking down into Long-Chain PFAS, including PFOA.  Valero relied on such statements to their detriment in purchasing and using Manufacturer Defendants' AFFF Products.  Manufacturer Defendants' false statements were made with the intention that Valero and others would reply upon them. Manufacturer Defendants, through the breach of a duty owed to Plaintiff, have gained an advantage by misleading Valero to its prejudice.

187.    Valero has incurred costs associated with addressing Manufacturer Defendants' AFFF Products because it acted in justifiable reliance upon false and misleading statements made by them in the promotion and sale of their products.  Valero's reliance was justifiable.

188.    On information and belief, New DuPont and Corteva assumed Old DuPont's liability for damages described above.

**F.     Unjust Enrichment**

189.    Plaintiff realleges and incorporates paragraphs 1 through 188 as if fully stated herein.

190.    Valero has incurred and will continue to incur expenses in connection with the use and presence of Manufacturer Defendants' AFFF Products at the Sites, including disposal and replacement costs of unused products, and identification, investigation, monitoring, remediation, assessment, and other costs incurred as a result of the Defendants' fraud and other acts and/or omissions described herein.

191.    Defendants are responsible for expenditures related to Manufacturer Defendants' AFFF Products and Long-Chain PFAS, including PFOS and/or PFOA, which were caused by the use of their products.  In accordance with equitable principles, Manufacturer Defendants should

have to pay these costs.  It would be unjust for Manufacturer Defendants to retain the benefit of Valero's expenditures incurred in connection with their products.  For Manufacturer Defendants to fail to make restitution to Valero would be inequitable.  Manufacturer Defendants have been unjustly enriched at Valero's expense.

192.     Accordingly, Valero requests restitution for the full amount by which Manufacturer Defendants were unjustly enriched and an injunction ordering Manufacturer Defendants to return all monies by which they were unjustly enriched as a result of Valero' expenditures in connection with Manufacturer Defendants' AFFF Products.

193.     On information and belief, New DuPont and Corteva assumed Old DuPont's liability for damages described above.

## G.     Common Law and UCC Breach of Implied Warranties

194.     Plaintiff realleges and incorporates paragraphs 1 through 193 as if fully stated herein.

195.     Manufacturer Defendants are merchants with respect to Manufacturer Defendants' AFFF Products.

196.     Manufacturer Defendants' AFFF Products are not fit for the ordinary purposes for which such goods are used and are not adequately labeled.

197.     Manufacturer Defendants' AFFF Products are not merchantable.

198.     At the time of contracting, Manufacturer Defendants knew the particular purpose for which their products were required.  Manufacturer Defendants' AFFF Products were not fit for such purpose.

199.     Valero relied on Manufacturer Defendants' skill and judgment to furnish suitable goods.

200.     Manufacturer Defendants, in selling their products, breached implied warranties of merchantability and fitness, which were a producing and proximate cause of Plaintiff's damages.

201.     On information and belief, New DuPont and Corteva assumed Old DuPont's liability for damages described above.

**H.     Actual Fraudulent Transfer in Relation to Chemours Spinoff
(Old DuPont, Chemours, New DuPont and Corteva)**

202.     Plaintiff realleges and incorporates paragraphs 1 through 201 as if fully stated herein.

203.     Through their effectuation of the Chemours Spinoff, Chemours and Old DuPont caused Chemours to transfer valuable assets to Old DuPont, including the $3.9 billion dividend (the "Chemours Transfers"), while simultaneously assuming significant liabilities (the "Chemours Assumed Liabilities").

204.     The Chemours Transfers and Chemours Assumed Liabilities were made for the benefit of Old DuPont.

205.     At the time that the Chemours Transfers were made and the Chemours Assumed Liabilities were assumed, and until the Chemours Spinoff was complete, Old DuPont was in a position to, and in fact did, control and dominate Chemours.

206.     Chemours and Old DuPont made the Chemours Transfers and incurred the Chemours Assumed Liabilities with the actual intent to hinder, delay and defraud the creditors or future creditors of Chemours such as Valero.

207.     Valero has been harmed as a result of the conduct of Chemours and Old DuPont.

208.     Under Oklahoma's Fraudulent Transfer Act, 24 O.S. §§ 112, et seq., and Delaware Code Tit. 6 Sec. 1301-1312, Valero is entitled to avoid the Chemours Transfers and to recover

property or value transferred to and held by Old DuPont, to injunctive relief against further disposition of the transferred assets, and all other relief to which it has rights at law or in equity.

209.    On information and belief, Corteva and New DuPont assumed Old DuPont's liability for actual fraudulent transfers described above.

I.    **Constructive Fraudulent Transfer in Relation to Chemours Spinoff**
      **(Old DuPont, Chemours, New DuPont and Corteva)**

210.    Plaintiff realleges and incorporates paragraphs 1 through 209 as if fully stated herein.

211.    Chemours did not receive reasonably equivalent value from Old DuPont in exchange for the Chemours Transfers and Chemours Assumed Liabilities.

212.    Each of the Chemours Transfers and Chemours' assumption of the Chemours Assumed Liabilities was made to or for the benefit of Old DuPont.

213.     At the time that the Chemours Transfers were made and the Chemours Assumed Liabilities were assumed, and until the Chemours Spinoff was complete, Old DuPont was in a position to, and in fact did, control and dominate Chemours.

214.    Chemours and Old DuPont made the Chemours Transfers and assumed the Chemours Assumed Liabilities when Chemours was engaged or about to be engaged in a business for which its remaining assets were unreasonably small in relation to its business.

215.    Chemours was insolvent at the time or became insolvent as a result of the Chemours Transfers and its assumption of the Chemours Assumed Liabilities.

216.    At the time that the Chemours Transfers were made and Chemours assumed the Chemours Assumed Liabilities, Chemours and Old DuPont intended to incur, or believed or reasonably should have believed that Chemours would incur, debts beyond its ability to pay as they became due.

217.    Valero has been harmed as a result of the Chemours Transfers.  Under Oklahoma's Fraudulent Transfer Act, 24 O.S. §§112, et seq., and Delaware Code Tit. 6 Sec. 1301 to 1312, Valero is entitled to avoid the Transfers and to recover property or value transferred to or held by Old DuPont, to injunctive relief against further disposition of the transferred assets, and all other relief to which it has rights at law or in equity.

218.    On information and belief, Corteva and New DuPont assumed Old DuPont's liability for constructive fraudulent transfers described above.

**J.     Actual Fraudulent Transfer in Relation to Dow-DuPont Merger and Subsequent Restructurings, Asset Transfers and Separations (Old DuPont, New DuPont and Corteva)**

219.    Plaintiff realleges and incorporates paragraphs 1 through 218 as if fully stated herein.

220.    Following the Dow-DuPont Merger, and through the separations of New DuPont, New Dow, and Corteva, Old DuPont sold or transferred, directly or indirectly, valuable assets and business lines to Corteva and New DuPont (the "Old DuPont Transfers").

221.    The Old DuPont Transfers were made for the benefit of New DuPont or Corteva.

222.    At the time that the Old DuPont Transfers were made, New DuPont was in a position to, and in fact did, control and dominate Old DuPont and Corteva.

223.    Old DuPont, New DuPont and Corteva acted with the actual intent to hinder, delay and defraud the creditors or future creditors such as Valero.

224.    Valero has been harmed as a result of the Old DuPont Transfers.

225.    Under Oklahoma's Fraudulent Transfer Act, 24 O.S. §§ 112, et seq., and Delaware Code Tit. 6 Sec. 1301-1312, Valero is entitled to avoid the Old DuPont Transfers and to recover property or value transferred to and held by New DuPont and Corteva, to injunctive relief against

further disposition of the transferred assets, and all other relief to which it has rights at law or in equity.

**K.     Constructive Fraudulent Transfer in Relation to Dow-DuPont Merger
and Subsequent Restructurings, Asset Transfers and Separations
(Old DuPont, New DuPont and Corteva)**

226.     Plaintiff realleges and incorporates paragraphs 1 through 225 as if fully stated herein.

227.     Old DuPont did not receive reasonably equivalent value from New DuPont and Corteva in exchange for the Old DuPont Transfers.

228.     Each of the Old DuPont Transfers was made to or for the benefit of New DuPont or Corteva.

229.      At the time that the Old DuPont Transfers were made, New DuPont was in a position to, and in fact did, control and dominate Old DuPont and Corteva.

230.     Old DuPont made the Old DuPont Transfers when it was engaged or about to be engaged in a business for which its remaining assets were unreasonably small in relation to its business.

231.     Old DuPont was insolvent at the time or became insolvent as a result of the Old DuPont Transfers.

232.     At the time that the Old DuPont Transfers were made, Old DuPont intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

233.     Valero has been harmed as a result of the Old DuPont Transfers.   Under Oklahoma's Fraudulent Transfer Act, 24 O.S. §§112, et seq., and Delaware Code Tit. 6 Sec. 1301 to 1312, Valero is entitled to avoid the Old DuPont Transfers and to recover property or value

transferred to or held by New DuPont and Corteva, to injunctive relief against further disposition of the transferred assets, and all other relief to which it has rights at law or in equity.

**L.     Violation of the Oklahoma Consumer Protection Act**

234.    Plaintiff realleges and incorporates paragraphs 1 through 233 as if fully stated herein.

235.    Plaintiff is a consumer of Manufacturer Defendants' AFFF Products.

236.    Manufacturer Defendants engaged in unlawful practices. Specifically, Manufacturer Defendants made false representations, knowingly or with reason to know, as to the characteristics, uses, and benefits, of their products, which were the subject of a consumer transaction, and committed unfair and deceptive trade practices, as defined by 15 O.S. § 752, through misrepresentations, omissions, and other practices that have deceived and could reasonably be expected to have deceived or mislead a person to the detriment of that person and though practices which offend established public policy and which are immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

237.    Manufacturer Defendants' unlawful practices occurred in the course of Manufacturer Defendants' business

238.    Manufacturer Defendants' unlawful practices caused an injury in fact to Plaintiff, as a consumer.

239.    Manufacturer Defendants' commission of acts and practices in violation of the Oklahoma Consumer Protection Act are unconscionable.

240.    As a result of Manufacturer Defendants' unlawful practices, Plaintiff has sustained actual damages and has incurred costs of litigation.

241.     On information and belief, New DuPont and Corteva assumed Old DuPont's liability for damages described above.

## VI.
## COMPLIANCE WITH GOVERNMENT STANDARDS

242.     No mandatory safety standard or regulation adopted and promulgated by the federal government or an agency of the federal government was applicable to the Manufacturer Defendants' AFFF Products at the time they were manufactured that governed any product risk that caused Plaintiff's damages.

## VII.
## DAMAGES

243.     **Actual Damages.**  Plaintiff seeks all damages allowed at law.  As a direct and proximate result of the foregoing events, Plaintiff suffered damages in the past, and will in reasonable probability have damages in the future, all for which suit is now brought.

244.     **Exemplary Damages.**  As a result of all of Defendants fraud, gross negligence, reckless conduct, wanton conduct, malicious conduct, and intentional conduct, Plaintiff seeks exemplary damages against all of the Defendants in an amount deemed appropriate by the jury.

245.     **Prejudgment and post-judgment interest.**  Plaintiff seeks pre-judgment and post-judgment interest at the highest rate allowed by law.

## VIII.
## REQUEST FOR JURY TRIAL

246.     Plaintiff hereby requests a trial by jury.

## IX.
## CONDITIONS PRECEDENT

247.     All conditions precedent to Plaintiff's rights to recover herein and to Defendants' liability have been performed, have occurred, or have been waived by Defendants.

## PRAYER FOR RELIEF

WHEREFORE, Valero requests judgment in its favor and against all of the Defendants as follows:

a.     Holding and declaring all Defendants to be strictly liable, and jointly and/or severally liable as appropriate, to Valero for the claims set forth above, and awarding Valero damages consisting of costs incurred and to be incurred in responding to any contamination caused by the Manufacturer Defendants' AFFF Products, and damages for injury to, destruction of, and loss of Valero's property, including the costs of disposing of and replacing unused products, and assessing, monitoring and/or remediating damages, and the costs of experts needed to make such an assessment;

b.     Ordering injunctive relief and requiring all of the Defendants to perform investigative and remedial work in response to any threats and/or damages they have caused;

c.     Awarding damages to pay for the remediation and/or restoration of the Long-Chain PFAS chemicals and/or for efforts, and/or to pay for the diminution in market value for each of the Sites;

d.     Ordering the Chemours Transfers and Old DuPont Transfers void to the extent necessary to satisfy Valero's claims;

e.     Enjoining New DuPont from selling, distributing, transferring, capitalizing, or otherwise disposing of the business lines, segments, divisions, or other assets that formerly belonged to Old DuPont, and/or imposing a constructive trust over the proceeds of any such transactions for the benefit of Valero;

f.     Awarding exemplary damages in an amount to be determined at trial;

g.     Awarding Valero's reasonable attorneys' fees and costs;

h.     Award Valero a civil penalty in the amount of $2,000 for each unconscionable act or practice of Defendants in violation of the Oklahoma Consumer Protection Act;

i.      Require Defendants to forfeit and pay a civil penalty of $10,000 per violation of the Oklahoma Consumer Protection Act;

j.      Awarding equitable relief for Valero's reasonably expected future damages as set forth above; and

k.      Awarding such other and further relief at law and/or in equity that the Court deems appropriate.

Dated: September 25, 2020                    Respectfully Submitted,

                                             KELLEY DRYE & WARREN LLP

                                   By:   **/s/ William J. Jackson**

                                         William J. Jackson
                                         John D.S. Gilmour
                                         515 Post Oak Boulevard
                                         Suite 900
                                         Houston, TX 77027
                                         (713) 355-5005
                                         BJackson@kelleydrye.com
                                         JGilmour@kelleydrye.com

                                         Martin A. Krolewski
                                         KELLEY DRYE & WARREN LLP
                                         101 Park Avenue
                                         New York, NY 10178
                                         (212) 808-7800
                                         MKrolewski@kelleydrye.com

                                         D. Kenyon Williams, Jr., OBA #9643
                                         HALL, ESTILL, HARDWICK, GABLE,
                                         GOLDEN & NELSON, P.C.
                                         320 S. Boston Ave., Suite 200
                                         Tulsa, OK  74103-3706
                                         (918) 594-0400
                                         kwilliams@hallestill.com
                                         ATTORNEY TO BE NOTICED

                                         *Attorneys for Plaintiff*